**UNITED STATES of America,**
**Appellee,**

v.

**Scott ANSALDI, Rodney Dean Gates,**
**Defendants–Appellants.**

**No. 03–1259L, 03–1273(CON).**

United States Court of Appeals,
Second Circuit.

Argued: Jan. 26, 2004.

Decided: June 16, 2004.

Peter J. Tomao, Law Office of Peter J. Tomao, Esq., New York, NY, for Defendant–Appellant Scott Ansaldi.

Bruce Harvey, Law Office of Bruce Harvey, Atlanta, GA, (Mark Yuracheck, L. David Wolfe, P.C., Atlanta, GA, on the brief), for Defendant–Appellant Rodney Dean Gates.

James Miskiewicz, Assistant United States Attorney, for Roslynn R. Mauskopf, United States Attorney for the Eastern

District of New York, (Barbara D. Underwood, Assistant United States Attorney, of counsel), for Appellee.

Before: NEWMAN and CALABRESI, Circuit Judges, and UNDERHILL,* District Judge.

UNDERHILL, District Judge.

This appeal concerns the application of the Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801 *et seq.*, to the chemical substance gamma butyrolactone ("GBL"). Under certain circumstances—most notably upon human ingestion—GBL converts into the chemical gamma hydroxybutyric acid ("GHB"), a Schedule I controlled substance that is commonly known as a date-rape drug. Scott Ansaldi and Rodney Gates ("Defendants") sold GBL over the internet, and were convicted of conspiracy to distribute GHB, conspiracy to distribute GBL, and conspiracy to launder money. Their appeal requires us to answer two questions: (1) Is the definition of "controlled substance analogue" contained in 21 U.S.C. § 802(32) unconstitutionally vague as applied to GBL? (2) Can a defendant who sells GBL be convicted of both a conspiracy to distribute GBL as an analogue of GHB and a conspiracy to distribute GHB itself?

The question of the vagueness of the term "controlled substance analogue" was recently addressed by this Court in *United States v. Roberts*, 363 F.3d 118, 125–26 (2d Cir.2004). We find the reasoning of that opinion applicable here as well, and therefore do not find the statute vague as applied to the sale of GBL. Because Defendants engaged in only one conspiracy, however, even if they conspired to violate two laws, they could not be convicted on

two counts of conspiracy. Accordingly we agree with Defendants that one of the conspiracy convictions must be vacated.

Defendants also make a host of arguments relating to the admission of evidence and the charging of the jury. All are without merit.

BACKGROUND

1. *GHB and GBL*

GHB is a behavioral depressant; upon ingestion, its effects are somewhat similar to those of alcohol. There is also some evidence that it stimulates the body's production of growth hormones. In 1999, Congress became aware of significant problems stemming from the drug's presence in sexual-assault and driving-under-the-influence cases. In response to these problems, Congress enacted the Hillory J. Farias and Samantha Reid Date–Rape Drug Prohibition Act of 2000 ("Date–Rape Drug Act"), which resulted in the scheduling of GHB as a Schedule I controlled substance. Pub.L. No. 106–172, 114 Stat. 7 (2000) (codified as amended in scattered sections of 21 U.S.C.).

Congress also noted a significant and growing problem for law enforcement arising from the use of various precursors and analogues to GHB. Specifically, Congress expressed concern about the fact that "[i]f taken for human consumption, common industrial chemicals such as gamma butyrolactone ... are swiftly converted by the body into GHB." *Id.* § 2. Although Congress did not schedule GBL as a controlled substance, it did make GBL a "listed chemical" subject to various registration requirements. *Id.* § 3 (codified at 21 U.S.C. § 802(34)(X)). It also noted that "[t]he designation of gamma butyrolactone

---

* Stefan R. Underhill, United States District Judge for the District of Connecticut, sitting by designation.

... as a listed chemical ... does not preclude a finding ... that the chemical is a controlled substance analogue." *Id.* § 5 (codified at 21 U.S.C. § 802(32)(B)).

2. *Defendants' Sale of "Verve"*

In 1999, John Goetz, Claudine Dematos and Ansaldi began using the internet to sell a product called "Invigorating." The active ingredient in Invigorating was GHB, which was then unregulated. The business—named Scott's Supplies—was successful and eventually hired two additional employees—Mitchell Dufanel and Berge Nalbantian.

At some point in 1999, Scott's Supplies learned of pending legislation that would prohibit the sale of GHB and, perhaps in anticipation, ceased selling Invigorating. Invigorating was quickly replaced with a new product, "Verve." Verve was a mixture of water, blueberry Kool–Aid, sugar and—most importantly—GBL. Scott's Supplies purchased Verve exclusively from Gates.

Scott's Supplies continued to purchase Verve from Gates and resell it, even after the passage of the Date–Rape Drug Act. In the summer of 2000, Ansaldi, Gates, Dematos and Goetz were arrested by DEA agents and local police. Goetz died before he could be tried. Dematos entered into a plea agreement, under which she agreed to testify against Ansaldi and Gates. Ansaldi and Gates proceeded to trial.

At trial the government introduced evidence that Gates and Ansaldi sold Verve for human consumption and that both of them had knowledge that GBL converted to GHB upon ingestion. The government also produced an expert who testified regarding the chemical similarity of GBL and GHB molecules. Although the evidence showed that some GBL actually converted to GHB in the bottle—and so Verve, in fact, contained GHB—no evidence suggested that either Ansaldi or Gates was aware of that fact.

The jury convicted Ansaldi and Gates of three of the counts charged in the indictment: (1) Count Three, knowingly and intentionally conspiring to distribute and possess with the intent to distribute the controlled substance GHB; (2) Count Four, knowingly and intentionally conspiring to distribute and possess with the intent to distribute for human consumption the controlled substance analogue GBL; (3) Count Five, conspiring to conduct financial transactions that affected interstate commerce using the proceeds of a specified unlawful activity. The District Court sentenced Gates principally to 80 months' incarceration and Ansaldi principally to 72 months' incarceration.

This appeal followed.

## DISCUSSION

1. *Vagueness*

Defendants contend that the definition of "controlled substance analogue" contained in 21 U.S.C. § 802(32) is unconstitutionally vague as applied to their conduct.[1] We find none of Defendants' arguments persuasive. Regardless of any other ways in which the laws governing controlled substance might be vague, there is one thing they make perfectly clear—the sale of GBL for human consumption is illegal.

A penal statute is void for vagueness if it does not define the criminal offense with sufficient definiteness to allow

---

1. This definition was applied to Defendants' conduct on account of the Analogue Statute, 21 U.S.C. § 813, which states: "A controlled substance analogue shall, to the extent intend-ed for human consumption, be treated, for the purposes of any Federal law as a controlled substance in schedule I."

ordinary people to understand what conduct is prohibited or if the statute is sufficiently indefinite to allow arbitrary or discriminatory law enforcement. *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). When technical terms are used in a statute, it is proper to look to the relevant science to explain them. *United States v. Jackson,* 968 F.2d 158, 161 (2d Cir.1992).

■ Before addressing Defendants' arguments, we point out that the subsection defining "controlled substance analogue" specifically states that "[t]he designation of gamma butyrolactone ... as a listed chemical ... *does not preclude* a finding ... that the chemical is a controlled substance analogue." 21 U.S.C. § 802(32)(B) (emphasis supplied). Thus, GBL is one of the substances that the statute actually identifies as a potential controlled substance analogue. Additionally, as noted above, in passing the Date–Rape Drug Act, Congress specifically found that GBL presented a significant law enforcement problem.

Defendants' main argument is that the statute's definition of an analogue is unclear to the extent it requires that the substance's chemical structure be "substantially similar to the chemical structure of a controlled substance." 21 U.S.C. § 802(32)(A)(i). They argue that this vagueness is exacerbated by the fact that

the determination whether a substance is an analogue is entrusted to a jury.

It is an interesting question under what circumstances a statute that depends on the resolution of a factual question about which reasonable juries can disagree is specific enough to withstand a vagueness challenge. That question is not presented here. Although a jury did make the determination that GBL was an analogue of GHB, that fact—independent of the jury's confirmation—is clear enough to have put an ordinary person on notice of the illegality of the sale of GBL for human consumption.[2]

This Court recently addressed this exact issue in the context of the distribution of another precursor to GHB—the chemical 1,4–butanediol. *Roberts,* 363 F.3d 118. *Roberts* held that when there is both readily cognizable similarity between the alleged analogue and the controlled substance prior to ingestion *and* metabolization of the alleged analogue into the controlled substance after ingestion, an ordinary person is sufficiently on notice that the chemicals are "substantially similar" within the meaning of the statute. *Id.* at 125. The *Roberts* panel held that the defendants in that case were sufficiently on notice that 1,4–butanediol— which differed from GHB by two atoms,

**2.** Defendants' briefs attempt to make two separate arguments: (1) that the statute is void for vagueness, and (2) that it is an improper delegation of legislative power. The theory of the latter argument is that it is improper for Congress to allow a jury to determine the scope of the element of a crime—in this case "substantial similarity." These two arguments are in fact one. Juries are often required to determine not only whether certain conduct occurred but also whether the conduct falls within the definition of a statute. In fact, when considering an obscenity law, the Supreme Court has gone as far as saying

that "the possibility that different juries might reach different conclusions as to the same material does not render the statute unconstitutional." *Smith v. United States,* 431 U.S. 291, 309, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977). Of course, if a statute's terms are so vague that a jury's determination is likely to be arbitrary, and, consequently, those terms would not allow an ordinary person to understand what conduct is prohibited, then the statute may be unconstitutional. That, however, is nothing more than a restatement of the proposition that statutes must not be unconstitutionally vague—the issue we address here.

and converted into GHB upon ingestion—was a controlled substance analogue. *Id.*

Here, the government's expert offered uncontroverted testimony that GBL's chemical structure differed from that of GHB by only three atoms. He also testified that GBL converted into GHB after ingestion. On these facts—both of which were either known to or readily ascertainable by Defendants—the decision in *Roberts* makes clear that Defendants had sufficient warning that GBL was a controlled substance analogue and that its distribution for human consumption was illegal.

Defendants' other arguments on this subject are adequately addressed by the decision in *Roberts*. Accordingly, we conclude that the definition of "controlled substance analogue" is not unconstitutionally vague as applied to GBL.

## 2. *Multiplicity*

Though neither side raised it on appeal, at oral argument we raised the question whether or not it was possible to convict someone of both conspiracy to distribute GBL and conspiracy to distribute GHB, when the GHB count was predicated only on the fact that GBL converted to GHB in the body. We asked for supplemental briefing on this issue, which both parties subsequently provided. The government, in its supplemental brief, conceded that the two counts were multiplicitous and asked that we vacate the convictions on Count Three—the conspiracy to distribute GHB. We agree that the counts are multiplicitous and that the convictions on Count Three should be vacated.

■ An indictment is multiplicitous if it charges the same crime in two counts. *United States v. Handakas*, 286 F.3d 92, 97 (2d Cir.2002), *overruled in part on other grounds, United States v. Rybicki*, 354 F.3d 124, 144 (2d Cir.2003) (in banc). The primary problem is that the jury can con-

vict on both counts, resulting in two punishments for the same crime in violation of the Double Jeopardy Clause of the Fifth Amendment. *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir.1999). When, as here, the same statutory violation is charged twice, the question is whether the facts underlying each count were intended by Congress to constitute separate "units" of prosecution. *Bell v. United States*, 349 U.S. 81, 83–84, 75 S.Ct. 620, 99 L.Ed. 905 (1955).

■ In this case, it is true that each count undoubtedly required proof of something that the other did not; that is, the counts are not identical. The theory of Count Three required the government to prove that GBL converted to GHB in the body and that Defendants were aware of that. Count Four required proof that Defendants intended to distribute GBL for human consumption, as well as that GBL met the requirements for being a controlled substance analogue. Nevertheless, none of the facts peculiar to each count is relevant to the "unit" of prosecution of the count. It is not the conduct that underlies the offense that matters for multiplicity analysis, but rather "the 'offense'—in the legal sense, as defined by Congress." *Chacko*, 169 F.3d at 146.

■ Both counts charge a conspiracy in violation of 21 U.S.C. § 846. The act of conspiracy was the agreement to possess and distribute Verve. Possession and distribution of Verve may have been in violation of two laws, but that does not mean that there were two conspiracies. A conspiracy is not the same crime as the underlying violation that it contemplates. "The conspiracy is the crime, and that is one, however diverse its objects.... The single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute." *Braverman v. Unit-*

*ed States,* 317 U.S. 49, 54, 63 S.Ct. 99, 87 L.Ed. 23 (1942) (internal quotation marks omitted).[3] Accordingly, charging one agreement to distribute one substance as multiple conspiracies is not possible, even if the distribution of the substance itself may violate more than one law. *Accord United States v. Peacock,* 761 F.2d 1313, 1319 (9th Cir.1985) (indictment for two conspiracies, one to distribute amphetamine and the other phenyl–2–propanone, was multiplicitous when only one agreement was alleged).

▮ Ordinarily, when a defendant is convicted of multiplicitous counts, the district court should vacate one of the convictions. It is appropriate in certain circumstances, however, for the appeals court to order one of the counts vacated. *See, e.g., United States v. Ben Zvi,* 168 F.3d 49, 58 (2d Cir.1999).

In this case, there are potential problems with Count Three aside from multiplicity. In particular, there is some question whether the government proved that both Ansaldi and Gates knew GBL converted to GHB on ingestion.[4] Accordingly, we hereby vacate Defendants' convictions on the charge set forth in Count Three.

3. *Effect on Count Five*

▮ In their supplemental briefs, Defendants argue that, if we vacate the convictions on Count Three of the indictment, we must vacate the convictions on Count Five—the money laundering count—as well. Their argument is that the jury was instructed that the specified unlawful conduct element charged was "controlled substance trafficking," and, once the convictions on Count Three are vacated, that predicate is gone. This argument misunderstands—or badly prejudges—the nature of our holding. A finding of multiplicity, and subsequent vacatur of one of the multiplicitous counts, does not overturn any of the factual findings made by the jury. It simply says that, as a matter of law, the jury found the same thing twice. Thus, the decision to vacate the conviction on Count Three does not undercut any part of the jury's findings that Defendants were trafficking in controlled substances, the predicate for the money laundering charge. We do not hold that Defendants were not trafficking in GHB. We do not even hold that it would be impossible for a defendant to be convicted of both *distributing* GBL and *distributing* GHB in two separate counts.[5] We simply hold that when an indictment charges a conspiracy to distribute both drugs, and that conspiracy is predicated on the existence of one agreement, only one conviction under 21 U.S.C. § 846 is possible. In other words, despite the jury's findings,

---

3. Ordinarily, courts apply the so-called "Blockburger test," *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), to determine whether or not two charged offenses constitute different crimes. That analysis is inappropriate in this case, because there is only one statute at issue, and so, nothing to compare. Rather than determining whether one act falls within two distinct statutes, as in *Blockburger,* we are asking whether two acts constitute one statutory offense.

4. This has no bearing on our holding on the issue of vagueness. The fact that particular defendants may not have actually known their conduct was illegal does not make a statute vague.

5. It is worth noting that this question is still open. Although the general rule is that a defendant can be punished for two violations of 21 U.S.C. § 841 arising from one act of possession or distribution of multiple controlled substances, *see United States v. DeJesus,* 806 F.2d 31, 36–37 (2d Cir.1986), we express no opinion whether Congress had a different intention when the two substances are a controlled substance and its analogue.

which we do not disturb, Congress intended only one punishment for this activity.

A slightly stronger version of Defendants' argument is that the potential problems with the government's proof of Count Three noted above, coupled with the hypothetical possibility that the jury may have premised its verdict on Count Five *solely* on the conviction for Count Three, requires us to vacate Count Five. This argument fails because it is not possible, even theoretically, for the jury to have based its Count Five finding of guilt on Count Three without also having based the finding on Count Four. Thus, even were we to find that as a matter of law Defendants did not traffic in GHB, there would still be no basis for overturning the jury's verdict on Count Five.

The jury found that Defendants engaged in a conspiracy to distribute GBL, a controlled substance analogue. The jury was appropriately instructed that, under 21 U.S.C. § 813, a controlled substance analogue is, to the extent intended for human consumption, considered to be a controlled substance. Thus, the jury was aware that, upon finding that Defendants distributed GBL, it had found a sufficient predicate for money laundering. The jury also found that Defendants distributed GHB, but that only means it found *additional* facts—namely, that GBL converted to GHB and that Defendants possessed a culpable state of mind with respect to distribution of GHB. What is not possible is that the jury found that the distribution of GHB was a *separate* act from the distribution of GBL. Consequently, because on the record evidence the jury could not have found Defendants distributed GHB and not GBL, there can be no dispute that the jury found a sufficient factual predicate to support a count of money laundering—namely, trafficking in GBL.

### 4. *Other Issues*

#### a. *Constructive Amendment*

Ansaldi and Gates ask us to vacate their convictions on Count Five of the indictment, on the ground that they were convicted in violation of the Fifth Amendment. Specifically, they argue that Judge Seybert improperly amended the indictment in her charge to the jury, thereby allowing the jury to convict Gates and Ansaldi of a crime not charged in the indictment.

Count Five charges Defendants with a money laundering conspiracy. It alleges that they conspired to conduct financial transactions that affected interstate commerce, using the proceeds of unlawful activity. The last element is where the controversy lies. The indictment refers to "proceeds of specified unlawful activity, to wit: narcotics trafficking." The District Judge, however, instructed the jury that they could return a guilty verdict if they found Defendants had used the proceeds from their trafficking in "controlled substances." Ansaldi and Gates argue that the word "narcotics" has a specific meaning, given by 21 U.S.C. § 802(17), which does not include GBL. "Controlled substance," on the other hand, refers to a larger class of substances, including controlled substance analogues like GBL. Thus, Defendants argue, the District Court's instruction constructively amended the indictment by improperly broadening the scope of the unlawful activity from sale of narcotics to sale of controlled substances.

Constructive amendment of an indictment is a serious error. This Court has held that constructive amendment of an indictment during the course of a trial is a *per se* violation of the Grand Jury Clause of the Fifth Amendment. *United States v. Patino*, 962 F.2d 263, 265–66 (2d Cir.1992). A trial court constructively

amends an indictment when it broadens the basis of conviction beyond that charged in the indictment. *Id.* at 265. The Fifth Amendment violation entailed by such amendment is not rendered harmless by the mere fact that the defendant was not "surprised" by the change; every defendant has a right to be tried only on the charges returned by a grand jury. *United States v. Roshko*, 969 F.2d 1, 6 (2d Cir. 1992). On the other hand, not every variance between the words of the indictment and the evidence presented at trial or the instructions given to the jury amounts to a constructive amendment. An alteration of the charge is impermissible only if it affects an "essential element" of the offense. *Patino*, 962 F.2d at 266.

 Although the case law draws a fine line between those alterations that create constitutionally impermissible amendments and those that are merely permissible variations, this case does not lie near that boundary line. Rather, Count Five of the indictment in this case is perfectly clear and was not at all altered in scope by the District Court's instruction.

Defendants' argument is that narcotics is a narrower class than controlled substances, and therefore, to substitute the one for the other is to change the scope of the designated substance. Their premise is incorrect. Defendants are, of course, correct that the *statutory* definition of "narcotic drugs," 21 U.S.C § 802(17), delineates a subset of the larger class of controlled substances. Defendants overlook the most straightforward reading of the indictment, however, which does not employ the statutory definition of narcotics, but rather the broader, colloquial meaning of the word—trading in an illicit pharmaceutical.

A review of the indictment as a whole makes it clear that this is the appropriate reading. The indictment first lays out all the allegations concerning Defendants' conspiracy to acquire and distribute GBL. This description of Defendants' business of selling GBL is then incorporated by reference into the beginning of Count Five. Count Five's reference to "narcotics trafficking" then admits of only one plausible reading—that it is referring to Defendants' trade in GBL. Defendants' argument that the District Court broadened the meaning of narcotics as defined by 21 U.S.C. § 802(17) is a strawman. If the word "narcotics" in the indictment had the statutory meaning, there might be a question whether the indictment was impermissibly broadened by the jury charge. That is not the case. Rather, the indictment described in detail Defendants' trafficking in GBL and then referenced those events with the shorthand designation of "narcotics trafficking." Thus, the term "narcotics trafficking" in the indictment unambiguously—if inelegantly—referred to the sale of GBL. There is no obligation to read statutory definitions into every word of an indictment, particularly when the indictment as a whole makes clear that a different meaning is intended.

b. *Good Faith Defense*

 A criminal defendant is entitled to a jury instruction on any defense for which there is a foundation in the evidence. *United States v. Allen*, 127 F.3d 260, 265 (2d Cir.1997). That being said, this Court will not overturn a verdict when an instruction is refused, unless the proposed instruction (a) is legally correct, (b) has a basis in the record, and (c) is not present elsewhere in the instructions. *Id.*

 Gates and Ansaldi argue that the trial court erred in not granting their request to instruct the jury on the availability of a "good faith" defense to Counts Three, Four and Five of the indictment. They argue that there was evidence in the

record that they believed they were breaking no law by selling GBL. They point to several pieces of evidence that they claim demonstrate they did not know they were breaking the law.

First, they point to a DEA regulation stating that, "[c]hemical mixtures containing GBL ... are not subject to regulation." 65 Fed.Reg. 21,645 (Apr. 24, 2000) (codified at 21 C.F.R. pt. 1310). They argue that they could, and did, read this regulation—albeit incorrectly [6]—as providing that the sale of GBL in a "mixture" of sugar and Kool–Aid was not illegal.

Second, Defendants point out that GBL is only a controlled substance analogue to the extent it is sold for human consumption. 21 U.S.C. § 813. This, they argue, along with other evidence in the record concerning the marketing of Verve as a cleaning solvent, would have allowed a properly instructed jury to find that Gates and Ansaldi believed they were in compliance with the law by marketing Verve, which consists of a combination of GBL, Kool–Aid and sugar, ostensibly as a cleanser.

What Gates and Ansaldi are attempting to argue as a "defense" is that their mistake of law negates the intent element of the crimes of conviction. Ignorance or mistake of law is not a defense to all criminal charges. For the most part, the prosecution need not show that a defendant knew the illegality of the conduct with which he is charged. *United States v. Golitschek*, 808 F.2d 195, 202 (2d Cir.

1986). It is true that some crimes require proof of knowledge of a legal requirement, and, in proving those crimes, the prosecution must prove the requisite legal knowledge.[7] Gates and Ansaldi were not convicted of such a crime.

 It is unlawful for an individual "knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). Knowledge of, or intent to violate, the law is simply not an element of this offense. *See, e.g., United States v. Fuller*, 162 F.3d 256, 260 (4th Cir.1998) (holding trial court correctly refused to instruct the jury on availability of "mistake of law" defense to 21 U.S.C. § 841(a) charge). Defendants rely heavily on the Tenth Circuit decision in *United States v. Harting*, 879 F.2d 765 (10th Cir. 1989), a case involving a "good faith" defense to a charge of criminal tax evasion. Criminal tax evasion is perhaps the most well known example of a crime that—unlike a violation of section 841(a)—requires, as part of its *mens rea* element, proof of a defendant's knowledge of his legal duty. *United States v. Bishop*, 412 U.S. 346, 360–61, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973).

To the extent Defendants might be arguing that a violation of the Analogue Statute, 21 U.S.C. § 813, requires proof that Defendants intended to distribute the substance for human consumption, the jury was correctly charged. The District Court read the Analogue Statute to the jury and instructed them that they had to answer

---

**6.** Defendants do not dispute that this regulation is, in fact, unrelated to the crime with which they are charged. Among other things, the regulation itself points out that Congress expressly stated, in 21 U.S.C. § 802(32), that listed chemicals—such as GBL—might be found to be controlled substance analogues and therefore governed by section 813. In other words, the regulation does not even

purport to remove any substance from the realm of criminal conduct.

**7.** Even in those cases, ignorance of the law is not an affirmative defense; rather, it is the prosecution's burden to prove knowledge of the law, just as it must prove every other element of the offense. *Golitschek*, 808 F.2d at 203.

the question whether Defendants "conspired to possess GBL with the intent to distribute GBL for human consumption." No additional instruction was necessary.

Accordingly, Gates and Ansaldi's convictions on Count Four will not be overturned. Their proposed instruction was—to the extent based on a "mistake of law" defense—legally unsupported and—to the extent based on the requirements of the Analogue Statute—adequately given.

### c. Search

Gates argues that the District Court incorrectly admitted evidence obtained during a search of various storage facilities rented by him, because the search was conducted based on a warrant obtained with improperly procured evidence. Gates argues that, because the supporting pieces of evidence—rental papers—were improperly obtained, the resulting evidence should not have been admitted because it was "fruit of a poisonous tree." Gates contends that there were two problems with the way the supporting evidence was obtained: (1) officers entered his house with consent that was obtained by coercion, and (2) the officers' subsequent search of his house exceeded the scope of his consent.

 The District Court, after holding a suppression hearing, admitted the evidence obtained by the searches, finding that it was procured pursuant to a valid consent search. When suppression is denied, the evidence presented at the suppression hearing is reviewed in the light most favorable to the government. *United States v. Peterson,* 100 F.3d 7, 11 (2d Cir.1996). This Court will not overturn a district court's determination that there was voluntary consent to a search unless that determination was based on clearly erroneous findings of fact. *United States v. Hernandez,* 5 F.3d 628, 632 (2d Cir.

1993). Upon review of the record, we cannot say that the District Court's ruling was erroneous.

 With respect to consent to enter the house, the evidence at the hearing tended to show that Gates was arrested outside his house by five or six officers, that he was handcuffed, that he was read his *Miranda* rights, and that the officers then asked him whether he would like to give them his "pedigree" information outside or inside his house. Gates agreed to give the information inside the house.

This record supports the District Court's finding that the consent given to enter the house was voluntary. The fact that police drew their guns to effectuate the arrest does not necessarily establish coercion, neither does the fact that Gates was handcuffed. *See United States v. Kon Yu–Leung,* 910 F.2d 33, 41 (2d Cir.1990); *United States v. Crespo,* 834 F.2d 267, 271 (2d Cir.1987). The fact that Gates was not informed that there were places other than his front yard or his house where the questioning could take place also does not make his consent involuntary. Finally, even considering all these events together—the "totality of the circumstances"—we see little, if anything, to support the conclusion that Gates was coerced into allowing the officers to enter his house. Certainly there is nothing that suggests clear error on the part of the District Court.

With respect to the scope of Gates' consent to a search of his house, the evidence is slightly less clear. One witness testified that an agent first asked Gates "if there were any guns, weapons in the house or any drugs," to which Gates responded "no." The agent then asked, "Do you mind if we search?" Gates replied, "Sure, go ahead." The agent himself initially testified merely that "I asked [Gates] if we

have consent to search the house for any guns, money, drugs, et cetera. Mr. Gates said yes." On cross-examination by the defense, however, the agent testified to a colloquy more akin to that described by the first witness.[8]

The evidence here—viewed, as it must be, in the light most favorable to the government—supports the finding that the agent essentially asked Gates, "Can we search your house?," to which Gates responded in the affirmative. Although their prior conversation may have led Gates to believe the agents were looking only for weapons, guns and drugs (and, indeed, this may have been all the agents intended to do), what the agents requested, and what Gates—knowingly and voluntarily—permitted, was a search of his house.

Accordingly, we find no error in the District Court's determination that the evidence obtained as a result of the search of Gates' house was properly admitted.

### d. *Talk Paper*

Ansaldi appeals the District Court's decision to allow the government to introduce an "FDA Talk Paper" that, among other things, pointed out that GBL converted to GHB when taken orally and described the adverse effects of GBL ingestion. Ansaldi argues that the document was either not relevant or, if relevant, nevertheless inadmissible as hearsay or as unfairly prejudicial under Rule 403 of the Federal Rules of Evidence. None of these contentions has any merit.

█ The talk paper was admitted by the Court, not for the truth of its contents, but to show Defendants' state of mind.

Fed.R.Evid. 801(c). The jury was so instructed. Accordingly, there is no validity to the claim that the evidence was hearsay.

Ansaldi argues that the document was not relevant to show state of mind because there was no evidence that he had ever seen the document. This argument assumes an incorrect standard for determining relevance. Evidence is relevant if it makes more or less probable the existence of some fact of consequence to the litigation. Fed.R.Evid. 401.

In this case, Dematos testified that she had searched the FDA website for information, that she argued with Goetz about the information she found, and that Ansaldi was present for some of these arguments. Nalbantian testified that he received a copy of the FDA Talk Paper from Dematos.

It is true that the relevance of the talk paper—that is, its ability to make more probable the fact that Ansaldi knew certain information about GBL—depended on the jury's also drawing certain other inferences from the evidence. That circumstance poses no problem under the Federal Rules of Evidence; Rule 104(b) allows for the admission of evidence, even if its relevance is conditioned on a particular fact, so long as there is evidence upon which the jury could find the condition fulfilled.

In this case, Dematos' testimony that she downloaded information from the FDA website and discussed that information in Ansaldi's presence, coupled with Nalbantian's testimony that the FDA talk paper was given to him by Dematos, was sufficient to allow a jury to conclude that Ansaldi was aware of the contents of that

---

8. Q: You then asked Mr. Gates if there were any drugs, weapons or currency in the house?

 A: Yes, sir.

 Q: And then you asked if he could have—if you could have consent to search the house?
 A: That's correct.

paper. Because there was evidence supporting the condition—that Ansaldi learned the contents of the paper—the contents of the paper were relevant to Ansaldi's knowledge of GBL.

Ansaldi argues that this evidence should, nevertheless, have been excluded as unfairly prejudicial under Rule 403. A district court is, of course, in the best position to do the balancing required by Rule 403, and that balancing will not be disturbed unless there is a clear showing of abuse of discretion or that the decision was arbitrary or irrational. *United States v. Salameh,* 152 F.3d 88, 110 (2d Cir.1998). Here, although the paper did contain statements that GBL was harmful (some of which the District Court ordered redacted), it was also relevant to a key element of the prosecution's case. We are unable to conclude that the District Court's balancing of these factors in coming to its decision was either arbitrary or an abuse of discretion.

### e. *Hearsay*

Dematos testified, among other things, to various conversations she had with Goetz, who died prior to the trial. The District Court admitted these statements, pursuant to Federal Rule of Evidence 801(d)(2)(E) as non-hearsay statements made by a co-conspirator during and in furtherance of a conspiracy. In order to make this ruling the Court first, as was required, made a finding that the statements were in fact statements of a co-conspirator made in furtherance of and during the conspiracy. *See* Fed.R.Evid. 104(a) (court decides preliminary questions of admissibility); Fed.R.Evid. 801(d)(2) (court may consider proffered statements in determining whether statements are co-conspirator statements).

Gates objected at trial, and now argues on appeal, that those statements should not have been admitted against him be-

cause he was not, at least at the time the statements were made, part of the conspiracy. The District Court found otherwise, and our review of the record reveals that there was sufficient evidence from which the Court could have determined that Gates was in fact part of the conspiracy at the time Goetz's statements where made. Accordingly, we find no error in the District Court's ruling.

### f. *GBI Report*

Gates also argues on appeal that the District Court incorrectly excluded a report prepared by the Georgia Bureau of Investigation. The report tended to show that GBL had not converted to GHB in the bottle and was thus relevant to Gates' defense against Count Three. Because we vacate Gates' conviction on Count Three for the reasons stated above, there is no need to reach this issue.

### CONCLUSION

For the reasons set forth above, we VACATE Defendants' convictions on Count Three of the indictment. In all other respects the judgment of the District Court is AFFIRMED. The case is REMANDED to the District Court for any resentencing necessitated by the vacatur of the convictions on Count Three.