13-3410 (L)
*United States v. Demott*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2015

(Argued: March 9, 2016        Decided: October 9, 2018)

Docket Nos. 13-3410, 13-4283, 14-178

_____

UNITED STATES OF AMERICA,

*Appellee,*

v.

CHARLES DEMOTT JR., ROSARIO GAMBUZZA, and ERNEST SNELL,

*Defendants-Appellants.*[*]

_____

Before:

LEVAL, POOLER, and WESLEY, *Circuit Judges.*

Defendants appeal from their convictions in the United States District Court for the Northern District of New York (Glenn T. Suddaby, *J.*). Defendants were convicted under the Controlled Substance Analogue Enforcement Act of 1986 (the "Analogue Act"), 21 U.S.C. §§ 802(32)(A), 813, of conspiracy to deal in "controlled substance analogues." Defendants argue the Analogue Act is unconstitutionally vague as applied to these charges; that the evidence at trial was insufficient to support the convictions of Snell and Gambuzza; that the trial of Snell and Gambuzza was prejudiced by improper jury instructions relating to the knowledge element under the Analogue Act;

_____

[*] The Clerk of Court is respectfully directed to amend the caption as set forth above.

1

and that Gambuzza's trial was prejudiced by the receipt of inadmissible hearsay evidence.

Held, the Analogue Act is not unconstitutionally vague and the trial evidence was legally sufficient. However, Snell and Gambuzza were prejudiced by improper jury instructions on the knowledge element of the Analogue Act, and Gambuzza was also prejudiced by the receipt of inadmissible hearsay evidence. Accordingly, Demott's conviction on his guilty plea is AFFIRMED, and the convictions of Snell and Gambuzza are VACATED. Their cases are REMANDED for retrial.

Judge Richard C. Wesley concurs in this opinion and in addition by separate opinion.

STEVEN D. CLYMER (CARLA B. FREEDMAN, *on the brief*) *for* Grant C. Jaquith, UNITED STATES ATTORNEY FOR THE NORTHERN DISTRICT OF NEW YORK, Syracuse, NY.

JAMES SCOTT PORTER, Seneca Falls, NY *for* Charles Demott, Jr.; DONALD T. KINSELLA, Albany, NY *for* Rosario Gambuzza; JAMES P. EGAN (JAMES F. GREENWALD, *on the brief*), *for* LISA A. PEEBLES, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Syracuse, NY, *for* Ernest Snell.

LEVAL, *Circuit Judge*:

Defendants Rosario Gambuzza, Ernest Snell, and Charles Demott, Jr. appeal from their convictions under a Second Superseding Indictment (the "Indictment") in the United States District Court for the Northern District of New York (Glenn T. Suddaby, *J.*). All three were convicted under the

Controlled Substance Analogue Enforcement Act of 1986 (the "Analogue Act" or the "Act"), 21 U.S.C. §§ 802(32)(A), 813, of conspiracy to deal in "controlled substance analogues." Demott pleaded guilty to Count 1, which charged conspiracy to distribute and to possess with intent to distribute a controlled substance analogue, reserving his right to challenge the constitutionality of the Analogue Act on appeal. Gambuzza and Snell were tried before a jury and convicted on Count 1, as well as on Count 2, which charged conspiracy to import a controlled substance analogue in violation of 21 U.S.C. §§ 813, 960(a)(1) and (b)(3), and 963, and, in Gambuzza's case, on 19 counts of money laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2(b).

Defendants' principal contentions are that the Analogue Act is unconstitutionally vague as applied to these charges; that the evidence at the trial was insufficient to support the convictions of Snell and Gambuzza for the drug offense; that the trial Defendants were prejudiced by improper jury instructions relating to the element of knowledge under the Analogue Act; and that Gambuzza's trial was prejudiced by the receipt of inadmissible hearsay evidence. We agree with the latter two contentions and therefore vacate the convictions of Gambuzza and Snell by reason of errors in the jury

instructions and the receipt of prejudicial, inadmissible hearsay evidence.

Otherwise, we reject Defendants' arguments. We therefore affirm Demott's conviction on his guilty plea and remand for retrial of Snell and Gambuzza.

## BACKGROUND

The Indictment charged Defendants with conspiring in and around Syracuse, New York between January 2010 and April 2011 to import from China and deal in two "controlled substance analogues": 4-methylmethcathinone (known as "4-MMC" or "mephedrone") and 4-methyl-n-ethylcathinone (known as "4-MEC").[1] The term "controlled substance analogues" refers to substances that are similar to those listed as "controlled substances" in Schedule I or II of the CSA, 21 U.S.C. § 812. "Controlled substance analogues" are statutorily defined (as further discussed below) as substances that are "substantially similar" to Schedule I or II controlled substances—both in their chemical structure and in their actual, intended, or represented effect on the central nervous system (or "pharmacological

---

[1] While at the time of the conspiracy neither substance was listed in the schedules of controlled substances set forth in the CSA, 21 U.S.C. § 812, subsequently both have been added to Schedule I, so that, if the same conduct were repeated today, the charges would directly allege violation of the CSA, without reference to the Analogue Act.

effect"). *See Id*. § 802(32)(A).[2] Pursuant to § 813, "controlled substance analogue[s]," when intended for human consumption, are treated for the purposes of federal law as "controlled substance[s] in Schedule I" regulated by the CSA.

In the trial of Snell and Gambuzza, the evidence showed a scheme that originated with importations from China by co-conspirator Vincent Cizenski (who cooperated with the Government and testified against Snell and Gambuzza at trial). Cizenski had previously used MDMA (3,4-methylenedioxy-N-methamphetamine, also known as "Molly" or "ecstasy"), which is a controlled substance listed in Schedule I. In the course of searching the Internet for a similar drug, he came across a seller in China named Eric Chang (also known as Lei Zhang) who offered 4-MMC, a chemical compound that was not, at the time, listed in the schedules of the CSA.

---

[2] Although the wording of the statutory definition in § 802(32)(A) is arguably unclear on this point, we assume for purposes of this opinion, as have all the parties, that the requirement of substantial similarity in pharmacological effect is in addition to the requirement of substantial similarity in chemical structure. *See United States v. Roberts*, 363 F.3d 118, 121 (2d Cir. 2004) (assuming that these elements are conjunctive, rather than disjunctive, requirements).

Cizenski began to order 4-MMC from Chang and to sell the product to others, including another co-conspirator named William Harper, who also cooperated with the Government and testified at trial. Harper sold the drug to Gambuzza, and both Harper and Gambuzza subsequently ordered it directly from Chang. Snell and Demott both purchased the drug from Harper, with Snell at times giving Harper cocaine in exchange.

Chang initially sent the co-conspirators 4-MMC. He later began to fill their orders with 4-MEC instead. 4-MEC, like 4-MMC, was not listed in the CSA schedules at the time of the conspiracy. A controlled purchase from Harper for "Molly" in July 2010 was filled with 4-MMC. In contrast, controlled purchases from Harper in September and November 2010 were filled with 4-MEC. Similarly, packages shipped from Chang's company, CEC Limited, to Harper and Gambuzza in December 2010 were found, when seized by United States Customs and Border Protection ("Customs") at the border, to contain 4-MEC.

When placing orders with Chang, the co-conspirators (who paid with Western Union money orders) referred to 4-MMC as "Mp," signifying "mephedrone." Joint Appendix ("App.") 316-17. In shipping the substances,

Chang deceptively labeled them as "metal corrosion inhibitor" or "camphanic acid." *Id.* at 320. He usually included invoices reflecting false prices. The conspirators, including Snell and Gambuzza, used coded language in communicating with each other about the substances. For example, on one intercepted phone call, Gambuzza asked Harper if he had any "extra tanning sessions." *Id.* at 378. Harper testified that this was code for 4-MMC. On another call, Harper told Gambuzza that the "stuff that we like is now officially illegal in China," referring again to the 4-MMC they received from Chang, which had recently been made illegal by Chinese law. *Id.* at 379.

On April 12, 2011, law enforcement officials executed search warrants at the residences of Snell and Gambuzza. At Snell's residence, they found plastic bags containing 4-MEC and cocaine in the kitchen cabinets and in a Klondike ice cream bar box in the freezer. They also found a digital scale, a Tupperware dish, and a measuring spoon. At Gambuzza's residence, they found a digital scale, small plastic baggies, a shipping receipt from CEC Limited, a receipt for a money transfer to CEC Limited, and a sender's copy of a FedEx Ground order form for a shipment addressed to a co-conspirator in California.

With respect to the status of 4-MMC and 4-MEC as controlled substance analogues, the government submitted expert testimony that both substances are substantially similar in chemical structure to methcathinone, which is listed in Schedule I, and that their pharmacological effect is substantially similar to that of methcathinone and MDMA, which is also listed in Schedule I.

In August 2011, a federal grand jury returned a six-count indictment naming Demott, Gambuzza, and Snell, as well as 19 others. In June 2012, that indictment was replaced with a two-count superseding indictment, which charged a conspiracy to distribute, to possess with intent to distribute, and to import a controlled substance analogue. All three Defendants moved to dismiss the superseding indictment on the ground that the Analogue Act is unconstitutionally vague. The district court denied the motions.

The Second Superseding Indictment (described above), under which Defendants were convicted, was filed in January 2013. Demott and Snell each renewed their motions to dismiss it. The district court again denied the motions. Demott then pleaded guilty pursuant to a written agreement, reserving his right to appeal the denial of his motion to dismiss. Snell and

Gambuzza were tried before a jury and were convicted on all counts. All three now appeal.

**DISCUSSION**

I. Vagueness

All three Defendants assert on this appeal that the Analogue Act is unconstitutionally vague as applied to the facts of this case. Precedents establish that a statute is unconstitutionally vague if it fails to define the unlawful conduct with "sufficient definiteness that ordinary people can understand what conduct is prohibited," or if its vagueness makes the law unacceptably vulnerable to "arbitrary enforcement." *See Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983).

We recognize that making criminality depend on the "substantial similarity" of a substance to an expressly prohibited substance inevitably involves a degree of uncertainty. *Accord United States v. Makkar*, 810 F.3d 1139, 1143 (10th Cir. 2015) ("It's an open question, after all, what exactly it means for chemicals to have a 'substantially similar' chemical structure—or effect."). However, as the Supreme Court has recently explained, such "non-numeric," "qualitative standard[s]" abound in our law, and are not so inherently

problematic as to independently render a statute void for vagueness. *Sessions*

*v. Dimaya*, 138 S. Ct. 1204, 1215 (2018) (internal quotation marks omitted).

Further, the viability of Defendants' argument is substantially undercut by

the fact that the Supreme Court, our court, and other circuits have upheld the

Analogue Act against vagueness challenges.

In *McFadden v. United States*, the Supreme Court rejected a vagueness

challenge to the Analogue Act, characterizing the statute as "unambiguous."

135 S. Ct. 2298, 2307 (2015). This court, as well, has upheld the Analogue Act

against similar vagueness challenges. *See Roberts*, 363 F.3d at 125-26; *United*

*States v. Ansaldi*, 372 F.3d 118, 123-24 (2d Cir. 2004). Other circuits have

reached the same conclusion.[3] See *United States v. Turcotte*, 405 F.3d 515, 531-

---

[3] Although the wording of the statutory definition in § 802(32)(A) is arguably unclear on this point, we assume for purposes of this opinion, as have all the parties, that the requirement of substantial similarity in pharmacological effect is in addition to the requirement of substantial similarity in chemical structure. *See United States v. Roberts*, 363 F.3d 118, 121 (2d Cir. 2004) (assuming that these elements are conjunctive, rather than disjunctive, requirements). Concern for whether a criminal statute gives adequate notice of what conduct is prohibited is alleviated if a conviction is sustainable only if the defendant knows that his conduct is illegal. *See id.* at 123 ("Because the statute at issue here contains a scienter requirement, the defendants' vagueness challenge must be met with some measure of skepticism." (citation omitted)). In light of the Supreme Court's explanation of the Act's knowledge requirement in *McFadden*, however, the persuasiveness of that proposition is

32 (7th Cir. 2005) (collecting cases), *abrogated on other grounds by United States v. Novak*, 841 F.3d 721, 729 (7th Cir. 2016).

Defendants seek to distance their case from those precedents by arguing that the Analogue Act is unconstitutionally vague as applied to their case because, at the time of the alleged conspiracy, there had been no controlled, published human testing of 4-MMC and 4-MEC. They contend for that reason that they had no notice that 4-MMC and 4-MEC were substantially similar in pharmacological effect to any scheduled controlled substance and that the statute was susceptible to an arbitrary, guesswork approach to enforcement. The argument is not persuasive. Controlled human testing is not required for an ordinary person to understand the similarity in

---

open to question. As described more fully below, according to *McFadden's* explanation of the Act's knowledge requirement, it appears that a conviction under the Analogue Act could be sustained notwithstanding a finding that the defendant reasonably believed his conduct was lawful. *McFadden* explained that the Analogue Act would be satisfied if a jury found the defendant knew of the substantial similarity of his drug to a listed substance in chemical structure and pharmacological effect, even if he also believed his substance was legal. 135 S. Ct. at 2305. Thus, the Act's knowledge requirement, at least in some circumstances, is arguably not the sort of "scienter requirement" that tends to "mitigate a law's vagueness." *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499-500 (1982) (relying in part on an ordinance's scienter requirement that an item be "marketed for use with illegal cannabis or drugs" to uphold the ordinance against a vagueness challenge).

"stimulant, depressant, or hallucinogenic effect," 21 U.S.C. § 802(32)(A)(ii), of one substance to another.

Defendants argue further that their theory of the susceptibility of the statute to arbitrary enforcement is borne out by the Government's assertion in this case that a substance can satisfy the statutory definition of an analogue if its chemical structure is substantially similar to the chemical structure of one scheduled drug, while its pharmacological effect is substantially similar to the pharmacological effect of another scheduled drug. The Government's theory of the case allowed for a finding that 4-MMC and 4-MEC were controlled substance analogues because they were substantially similar in chemical structure to one listed drug (methcathinone) and substantially similar in pharmacological effect to another listed drug (MDMA). Defendants contend that such a hybrid basis is not permissible under the terms of the statute and that the Government's use of it shows that the vagueness of the statute invites arbitrary prosecution.

We disagree. What Defendants characterize pejoratively as a "hybrid" theory of interpretation of the Act is clearly contemplated by the statute's

words. The Analogue Act defines a "controlled substance analogue" in § 802(32)(A). It states:

> Except as provided in subparagraph (C) [listing exceptions not here relevant], the term "controlled substance analogue" means a substance—
> (i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;
> (ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or
> (iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

The statute addresses chemical structure and pharmacological effect in separate provisions. Clause (i), the provision referring to chemical structure, instructs that the chemical structure of the substance must be substantially similar to the chemical structure of *a* controlled substance in Schedule I or II. Clauses (ii) and (iii) relate to pharmacological effect—the stimulant, depressant, or hallucinogenic effect of the substance on the central nervous system. They state that the stimulant, depressant, or hallucinogenic effect on

the central nervous system, either actual, or as intended or represented, must be substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of *a* controlled substance in Schedule I or II. Nothing in the language of the Act suggests that the drug listed in Schedule I or II that is substantially similar in chemical structure to the analogue must be the same listed drug that is substantially similar to the analogue in pharmacological effect. *Accord United States v. Carlson*, 810 F.3d 544, 553 (8th Cir. 2016) ("While an analogue substance must have a similar chemical structure as a controlled substance, its physiological effects may be similar to a different controlled substance."). Defendants' argument that this aspect of their prosecution showed unacceptable vagueness of the Analogue Act is not persuasive.

II. Whether the Government Proved the Substances were Controlled Substance Analogues

Snell and Gambuzza next argue that the evidence was insufficient for the jury to conclude that 4-MMC and 4-MEC were controlled substance analogues. Conceding that the evidence established the chemical similarity of the substances to methcathinone, Defendants argue that the evidence was insufficient to establish their similarity in pharmacological effect to a

Schedule I or II controlled substance. To succeed, Snell and Gambuzza must meet the "heavy burden" of "show[ing] that no rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt." *United States v. Caracappa*, 614 F.3d 30, 43 (2d Cir. 2010) (internal quotation marks omitted).

We reject the argument. The Government presented evidence from which a reasonable juror could have concluded that 4-MMC and 4-MEC were substantially similar in pharmacological effect to a Schedule I or II controlled substance, as well as that the conspirators represented this to be so. First, there was expert testimony that 4-MMC and 4-MEC produced a stimulant effect similar to methcathinone and MDMA (both Schedule I controlled substances). Second, there was testimony from cooperating co-conspirators that the experience of using 4-MMC and 4-MEC was similar to the experience of using MDMA. In addition, cooperating co-conspirators testified that while selling 4-MMC and 4-MEC, they would "pass it off as Molly," App. 260, or would tell customers it was "just like E [meaning ecstasy]," *id.* at 586-87, referring to street names for MDMA. The evidence amply supported a finding that the pharmacological effects of 4-MMC and 4-MEC were, and were

represented by the conspirators to be, substantially similar to the effects of

methcathinone or MDMA.

III.   Sufficiency of Evidence of Gambuzza's Involvement in the
       Conspiracy

Gambuzza also challenges the sufficiency of the evidence with respect

to his involvement in the conspiracy. He argues that the evidence showed

only that he purchased from Chang, not that he ever sold. The argument is

frivolous. There was ample evidence from which a rational jury could have

concluded that Gambuzza conspired with named co-conspirators to import

the analogues, distribute them, and possess them with intent to distribute.

Harper testified that he and Gambuzza had used the substance together.

When Gambuzza required increasingly large quantities of it, he taught

Gambuzza how to order the substance directly from Chang. There was ample

evidence of distribution by Gambuzza, including the large volume of his

importations from Chang (multi-kilo quantities for which he paid $72,800 in a

one-year period) and the seizure by law enforcement authorities at his

residence of a shipping receipt for a package sent to a co-conspirator, a digital

scale, and baggies. Furthermore, there was substantial evidence of his

conspiratorial undertaking with Chang, who was also a charged co-

conspirator, to import and distribute the analogue substances. This evidence, considered together, was sufficient for a rational jury to conclude that Gambuzza was a participating member of the charged conspiracy.

IV.    Jury Instructions on Knowledge

Defendants argue their convictions must be set aside because of two alleged errors in the jury instructions:[4]

(1) They contend that under *McFadden*, courts must give a jury instruction that requires the jury to find that a defendant knew that the substances were controlled "under the CSA or Analogue Act, as opposed to any other federal or state laws," 135 S Ct. at 2306 n.3, and that the district court here failed to so instruct.

(2) They contend the district court violated the requirements of *McFadden* by telling the jury that "knowledge of, or intent to violate the law is not an element of the offense." App. 978.

---

[4] This court considers a jury instruction erroneous "if it misleads the jury as to the correct legal standard or does not adequately inform the jury of the law. When conducting this review, we examine the charges as a whole to see if the entire charge delivered a correct interpretation of the law." *United States v. Silver*, 864 F.3d 102, 118 (2d Cir. 2017) (citations, footnote, and internal quotation marks omitted).

We address each in turn.

> i. The District Court's Failure to Charge that Defendants Needed to Know the Substances were Controlled "under the CSA or Analogue Act."

In *McFadden*, the Supreme Court rejected the conclusion of the Court of Appeals that the sole knowledge requirement for conviction under the Analogue Act was the "inten[t] for human consumption." 135 S. Ct. at 2306 (internal quotation marks omitted). The Court held that "the Government must prove that a defendant knew that the substance with which he was dealing was 'a controlled substance,' even in prosecutions involving an analogue." *Id.* at 2305. Accordingly, the Court held that the jury charge at issue in that case ("McFadden had to knowingly and intentionally distribute a mixture or substance that has an actual, intended, or claimed [pharmacological effect] substantially similar to that of a controlled substance") failed to "fully convey the mental state required by the Analogue Act." *Id.* at 2307 (internal quotation marks and brackets omitted).

The Court explained that the Analogue Act requires that an analogue intended for human consumption "be treated, for the purposes of any Federal law as a controlled substance in schedule I," 21 U.S.C. § 813, so that the

18

knowledge requirement for prosecutions under the Analogue Act is derived from the CSA. *McFadden*, 135 S. Ct. at 2304-05. The CSA, in 21 U.S.C. § 841(a)(1), makes it unlawful "for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance," and other provisions prohibit "knowingly or intentionally" importing "a controlled substance." *Id.* § 960(a); *see also id.* § 952(a) (defining "[u]nlawful acts" to include a person "knowingly or intentionally import[ing] or export[ing] a controlled substance"). The CSA's knowledge requirement applies both to the particular prohibited verbs (*e.g.*, distribute, import, etc.) and to the object of the verbs ("a controlled substance"). *McFadden*, 135 S. Ct. at 2304. Accordingly, in a prosecution under the CSA, the Court held, "the Government [must] prove that a defendant knew he was dealing with a '*controlled substance*,'" and an analogous requirement applies "in prosecutions involving an analogue." *Id.* at 2305 (emphasis added). Because the trial court had not instructed the jury in that manner, the Supreme Court remanded for consideration of whether the error was prejudicial or harmless.

The *McFadden* Court rejected the government's contention that the knowledge requirement would be satisfied by proof that "the defendant knew he was dealing with an illegal or regulated substance *under some law*." *Id*. at 2306 (emphasis added) (internal quotation marks omitted). The Court explained, "Section 841(a)(1) . . . requires that a defendant knew he was dealing with 'a controlled substance.'" *Id*. Citing the CSA's definition of a controlled substance ("a drug or other substance . . . included in schedule I, II, III, IV, or V of part B of this subchapter," 21 U.S.C. § 802(6)), the Court said, "That term includes only those drugs listed on the federal drug schedules or treated as such by operation of the Analogue Act. It is not broad enough to include all substances regulated by any law." *Id.* (internal citations omitted).

The Supreme Court noted that circumstantial evidence may be used to prove the requisite knowledge. In footnote 1, the Court noted that, in undertaking to prove *mens rea*, the Government frequently, and properly, offers circumstantial evidence, such as of "a defendant's concealment of his activities, evasive behavior with respect to law enforcement, knowledge that a particular substance produces a 'high' similar to that produced by controlled substances, and knowledge that a particular substance is subject to seizure at

customs." *Id.* at 2304 n.1. In footnote 3, referring to prosecutions in which the government offers the types of circumstantial evidence previously mentioned in footnote 1, the Court announced, "In such cases, *it will be left to the trier of fact* to determine whether the circumstantial evidence proves that the defendant knew that the substance was a controlled substance under the CSA or Analogue Act, as opposed to under any other federal or state laws." *Id.* at 2306 n.3 (emphasis added). The Court thus stated that circumstantial evidence, such as furtive conduct, may be legally sufficient to establish the requisite knowledge under the Analogue Act.

The Court went on to say that there are two ways for the Government to establish the requisite knowledge. *Id.* at 2305. As to the first alternative, for prosecutions involving a listed substance (*i.e.*, prosecutions directly under the CSA), the government can prove the defendant knew the substance was a "controlled substance . . . actually listed on the federal drug schedules." *Id.* Analogously, in prosecutions involving an analogue, the Government can prove the defendant knew the substance was "treated as such by operation of the Analogue Act," *id.*, *i.e.*, the defendant knew that the substance was treated as a controlled substance actually listed on the federal drug schedules. In

either case, the Government does not need to show that the defendant knew the identity of the substance. *Id.* The Court explained that proof under this alternative could include, for example, "past arrests that put a defendant on notice of the controlled status of a substance." *Id.* at 2304 n.1.

As to the second way of proving the required knowledge for prosecutions under the CSA (involving listed substances), the Court said that the Government can prove a defendant knew the identity of the listed drug he was distributing (for example, heroin), even if he did not know that the drug was listed in the schedules. *Id.* at 2304.[5] The analogous method for drugs covered by the Analogue Act, however—unlike the case of a listed drug such as heroin—would require more than simply proving that the defendant knew what substance he was dealing in (such as "4-MMC" or "mephedrone"). The Court explained that because analogues are not actually listed in the federal drug schedules, a defendant who knows he is distributing mephedrone, unlike a defendant who knows he is distributing heroin, does not know "all

---

[5] As Chief Justice Roberts observed, this theory of knowledge is most appropriate for "well-known drugs such as heroin," where "a defendant's knowledge of the identity of the substance can be compelling evidence that he knows the substance is controlled." *McFadden*, 135 S. Ct. at 2307 (Roberts, C.J., concurring in part and concurring in judgment). Lesser known drugs will not necessarily give rise to the same inference.

of the facts that make his conduct illegal." *Id.* at 2305. To know all of the facts that make his conduct illegal, the defendant must know the *characteristics* of the substance that qualify that substance as an analogue—that is, its substantial similarity to a Schedule I or II controlled substance in chemical structure *and* actual, intended, or represented effect on the central nervous system. *Id.*

Although clarifying in some respects, *McFadden* also created ambiguity regarding the particular showing required under the first permissible method of proving knowledge. *McFadden* made clear that the defendant must know that the drug at issue was "controlled." *Id.* But a requirement to know that a substance was "controlled" could mean different things. For example, it could mean knowing that the substance was generally illegal (without knowing whether federal or state law controlled); knowing that the substance was illegal specifically under *federal law* (as opposed to state law); or knowing that the substance was illegal under the *particular controlling statute*, such as the CSA or Analogue Act. *McFadden* expressly rejected the first proposition, *id.* at 2306, but was unclear as between the second two. The opinion variously described the mental state requirement as: knowledge that "the substance in

question was a 'controlled substance' under federal law," *id.* at 2306 n.3; knowledge that "[the defendant] was dealing in some controlled substance—that is, one actually listed on the federal drug schedules or treated as such by operation of the Analogue Act," *id.* at 2305; and knowledge "that the substance was a controlled substance *under the CSA or Analogue Act, as opposed to any other federal or state laws*," *id.* at 2306 n.3 (emphasis added); *see also id.* at 2302 ("[The] knowledge requirement is met if the defendant knew that the substance was controlled under the CSA or the Analogue Act, even if he did not know its identity.");[6] *id.* at 2305 ("A defendant need not know of the existence of the Analogue Act to know that he was dealing with 'a controlled substance.'").

---

[6] Which of these alternative formulations was correct was an issue going beyond the holding of the case, as it had no possible effect on the outcome of case before the court. *McFadden*'s holding, as explained above, is that the instruction given at trial "did not fully convey the mental state required," *id.* at 2307; and that the government must establish that the defendant "knew he was dealing with 'a controlled substance,'" *id.* at 2302. As to the Court's further discussions of how the knowledge element might be proved—whether requiring a showing of knowledge that the substance was (i) listed on the federal drug schedule or treated as such by operation of the Analogue Act, or (ii) controlled "under the CSA or Analogue Act, as opposed to under any other federal or state laws," *id.* at 2306 n.3—the Court's disposition of the case would have been the same regardless of which specification was the correct one.

Defendants challenge the district court's failure to charge in accordance with *McFadden's* narrowest formulation, that, under the first alternative, Defendants must be shown to have known that their substances were "controlled under the CSA or the Analogue Act." *Id*. at 2302, 2306 n.3. Defendants point out that the district court did not instruct the jury precisely in accordance with that formulation. Instead, the district court instructed the jury that the Government had to prove that Defendants knew the substances with which they dealt were "controlled or regulated by federal drug abuse laws." App. 978.

Defendants are correct that *McFadden* did at times describe the knowledge element as knowledge that a substance is "controlled under the CSA or the Analogue Act." 135 S. Ct. at 2302, 2306 n.3. But, as noted above, the Court did not adhere consistently to this narrow articulation.

Furthermore, in stating that circumstantial evidence may suffice to establish knowledge, the Court explicitly approved examples of circumstantial evidence that would not support a logical inference that the defendant knew anything about the CSA or Analogue Act ("a defendant's concealment of his activities, evasive behavior with respect to law

enforcement, knowledge that a particular substance produces a 'high' similar to that produced by controlled substances, and knowledge that a particular substance is subject to seizure at customs," *id.* at 2304 n.1). Ordinarily, circumstantial evidence can prove only what can be logically inferred from the facts shown. "[E]vasive behavior," knowledge that a substance produces a high, and knowledge that a substance is subject to seizure at customs, simply do not show that a defendant knows the identity of the statute he is violating. *Id.*

Given *McFadden's* deviations from this narrow articulation of the knowledge requirement and other factors discussed below, we believe that the formulation requiring knowledge *of the CSA or Analogue Act* was not the Supreme Court's intended standard. It seems highly unlikely that the Supreme Court could have believed that Congress intended its drug prohibitions to apply only to defendants who are aware of the identity of the statute that makes their conduct illegal. Such a requirement would have created very substantial problems for many conventional trials of traffickers in drugs that are listed on the CSA's schedules. It is a rare case in which a drug dealer is shown to have known he was violating the CSA. Many

prosecutions would need to be dismissed—and convictions vacated on appeal—for absence of evidence showing either awareness of the CSA or knowledge of the identity of the illegal substance being trafficked. In addition, numerous convictions would need to be overturned by reason of faulty jury instructions because, prior to *McFadden*, few (if any) trial courts instructed juries that the government needed to prove the defendant knew the substance he dealt in was controlled expressly by the CSA. The same would be true for many prosecutions under the Analogue Act.

In light of all these considerations, we understand *McFadden*'s first method not to require proof that the defendant knew the substance was controlled *by the CSA or Analogue Act*, but rather to require proof that the defendant knew that the substance in question was a "controlled substance," *i.e.*, was controlled by federal drug laws. *Id.* at 2305. Other courts have applied *McFadden* similarly. *See United States v. Al Haj*, 731 Fed. App'x 377, 378-79 (5th Cir. 2018) (per curiam) (holding that evidence of the defendant's "evasive behavior," including his use of code names and the false labeling of packages, was sufficient to prove that the defendant "knew he was distributing a controlled substance" as required by *McFadden*); *United States v.*

*Anwar*, 880 F.3d 958, 967-68 (8th Cir. 2018) ), *reh'g denied* 880 F.3d 958 (March 2, 2018) (holding that evidence of the defendant's furtive conduct, and of his knowledge that the substance produced a high, was sufficient to support a conviction for distribution of a controlled substance or controlled substance analogue); *United States v. Louis*, 861 F.3d 1330, 1333-34 (11th Cir. 2017) (holding that the "government's evidence of presence and flight" was insufficient to support a conviction for conspiracy to deal in a controlled substance).

Here, the district court's instruction that the government had to that Defendants knew the substances were "controlled or regulated by federal drug abuse laws" complies with the Analogue Act and with *McFadden*. While the charge did not explicitly name the CSA, neither did it charge in the manner that the *McFadden* Court explicitly rejected, *i.e.*, that a defendant must know the substance is controlled by "some law." *McFadden*, 135 S. Ct. at 2306. We also observe that, while, technically, "the federal drug abuse laws" is a broader term than "the CSA," the two terms mean virtually the same thing, as the CSA is the central provision of the federal drug abuse laws. The district court's instruction came very close to literal conformity to what the *McFadden*

Court said, even in its narrowest characterization of the knowledge requirement. We find no error in the jury instruction that, to prove knowledge, the government must prove that Defendants knew the substances were "controlled or regulated by federal drug abuse laws." App. 978.

    ii. The District Court's Instruction that "Knowledge of . . . the Law is not an Element of this Offense."

    Snell and Gambuzza next argue that their convictions must be vacated because some of the court's instructions—either given during the presentation of evidence, in the jury charge at the close of the evidence, or in response to jury questions—conveyed to the jury, contrary to the Supreme Court's later elaborations in *McFadden*, that knowledge of the law was not an element of the offense. Examples of the problematic instructions are as follows:

    (a) To prove this element [of a defendant's knowledge], the government need not show . . . that the defendant knew that he might be involved in some sort of criminal activity. This is because *knowledge of or intent to violate the law, is not an element of this offense.* App. 978 (emphasis added).

    (b) [O]ne or both [defendants] may have been told that this substance was legal. *That is not a defense to these charges.* I can tell you that heroin is legal, [and ask you to] go out in the street and sell it. If you go out in the street and sell heroin and you get arrested, it's not a defense to say that guy told me it was legal. App. 1023 (emphasis added).

To the extent that these instructions communicated (or might have communicated) to the jury that knowledge of the law is not an element of the offense so that a defendant's belief that the substance was not controlled by law is not a defense, these instructions were not compatible with the analysis set forth in *McFadden*. They effectively deprived Defendants of the ability to defend against the Government's evidence on the knowledge element.

As described above, *McFadden* stated that a conviction under the Analogue Act requires the government to prove that a defendant "knew he was dealing with 'a controlled substance,'" 135 S. Ct. at 2302. It is readily apparent that the district court's instruction that knowledge of the law is not an element was inconsistent with this requirement. To the extent the jury might have found Defendants guilty under the first alternative way of proving knowledge, the jury would have been required to find that Defendants knew that the substances they dealt in were "controlled substances," meaning that they were controlled under federal drug laws. The jury was thus required to find, under this alternative, that Defendants knew

some law. It therefore cannot be, as the district court instructed, that

"knowledge of . . . the law is not an element of the offense."[7]

---

[7] Our finding of error in the district court's charge that knowledge of the law is not an element of the offense appears inconsistent with our pre-*McFadden* ruling in *Ansaldi*, 372 F.3d at 128, which upheld the trial court's rejection of the defendants' request to charge that they should be acquitted if they did not know they were breaking the law. The inconsistency, however, is not with the substance of *Ansaldi*'s rejection of the requested charge, but with the explanation given. The two-pronged standards enunciated by the Supreme Court in *McFadden* demonstrate the impropriety of both the charge requested by the *Ansaldi* defendants and the charge here given by the district court.

*McFadden* explained that there are two alternative ways of proving the requisite knowledge under the Analogue Act. The first alternative (showing that the defendant knew that the substance he dealt in was treated as controlled by the law) requires proof that the defendant knew some law; the second alternative (showing the defendant knew the substance's features) does not. The instruction requested by the *Ansaldi* defendants was defective because it was not restricted to the first alternative. The *Ansaldi* court was thus consistent with *McFadden* in refusing to give the overbroad charge.

The charge given by the district court in our case—that ignorance of the law is no defense—would have been consistent with *McFadden* if it had been limited to the second alternative. But, just as the *Ansaldi* defendants erred in failing to limit their request to the first alternative, the trial court here erred in failing to limit its charge to the second alternative. Had the charge been restricted to proof of guilt based on the second alternative, it would have been permissible, because, according to *McFadden*, ignorance of the law is not a defense when guilt is shown by proving the defendants' awareness of the substantial similarity of the analogue substance to a listed substance. 135 S. Ct. at 2306. *But see id.* at 2308 (Roberts, C.J., concurring in part and concurring in judgment) ("But when there is a legal element in the definition of the offense, a person's lack of knowledge regarding that legal element *can* be a defense. And here, there is arguably a legal element in Section 841(a)(1)—that the substance be controlled."(internal citations and quotation marks

The district court's analogy to heroin, which was offered to elucidate the concept that mistake of law was not a defense, was also misleading. It suggested to the jury that the knowledge requirement with respect to Defendants' dealings in analogue substances was the same as it would have been had they been dealing in heroin, which is a listed substance. But, under *McFadden*, evidence of dealing in heroin with the knowledge that it is heroin is sufficient to support a conviction. As for analogue substances, in contrast, more is required. *McFadden* stated that a defendant's knowledge of the identity of an analogue substance he dealt in (e.g., 4-MMC or 4-MEC) would not be sufficient. Under the second alternative, the government would be required to prove the defendant knew the *features* that brought the analogue

---

omitted)). Because the district court did not so restrict the charge, the charge applied equally to the first alternative—which, contrary to the court's instruction, *does* require proof of knowledge of law. Our rejection of the district court's instruction in this case is thus consistent with the *Ansaldi* court's rejection of the defendants' requested charge in that case.

On the other hand, *Ansaldi*'s *explanation* of its ruling—that "[k]nowledge of, or intent to violate, the law is simply not an element of [an Analogue Act violation]," 372 F.3d at 128—was irreconcilable with *McFadden* (and with this opinion) because it was not limited to the second alternative. Had *Ansaldi* explained its ruling by saying that "knowledge of, or intent to violate, the law is not an element *under the second alternative means of proof*" of an Analogue Act violation, it would have been consistent with *McFadden* and with this opinion.

substance within the scope of the Act—its substantial similarity to a listed drug, both as to chemical composition and pharmacological effect.

These erroneous instructions were not harmless. "Instructional error is harmless only if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *United States v. Moran-Toala*, 726 F.3d 334, 344 (2d Cir. 2013) (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)). On the record before us, we cannot conclude, beyond a reasonable doubt, that the verdicts for Snell and Gambuzza would have been the same absent these errors. Knowledge of the illegality of 4-MMC and 4-MEC was one of the central contested issues at trial. A key aspect of Snell's defense was a co-conspirator's testimony that he told Snell the substances were legal. Gambuzza's attorney focused nearly exclusively on knowledge in summation, pointing out that Gambuzza used his real address and bank account when ordering the substances from China, and that co-conspirators had represented the drugs to be legal.

It is true that the Government produced considerable circumstantial evidence suggesting that Snell and Gambuzza knew of the drugs' illegality under federal law—for example, that they spoke in coded language about

their shipments and knew the packages were subject to seizure at Customs. However, given the existence of contrary evidence, and the centrality of this issue at trial, we cannot conclude beyond a reasonable doubt that a rational jury would have convicted Snell and Gambuzza were it not for the erroneous instructions that "knowledge of . . . the law is not an element of the offense" and belief that the substance was legal is "not a defense to these charges."

Judged by the standards later announced by the Supreme Court in *McFadden*, those instructions failed to explain the law correctly as to the element of guilty knowledge, and Defendants were prejudiced by the errors. Snell and Gambuzza are therefore entitled to a new trial on Counts One and Two.

V.      Sufficiency of Evidence of Defendants' Knowledge

We next consider the contention by Snell and Gambuzza that the trial evidence was insufficient to show they possessed the requisite knowledge to sustain their convictions. We reject their argument. There was substantial circumstantial evidence to support a finding that they knew that their dealings violated federal drug laws.

As described in footnote 1 of *McFadden*, there was evidence of Defendants' "concealment of [their] activities, . . . and [of their] knowledge that [their] substance [was] subject to seizure at customs." *McFadden*, 135 S. Ct. at 2304 n.1. Intercepted text messages between Snell and Harper communicated in coded language about packages that had been seized at customs. In intercepted communications between Gambuzza and Harper, Gambuzza asked in code for "extra tanning sessions"—referring to mephedrone. App. 378. And Chang's shipments from China were falsely labeled as metal corrosion inhibitor or camphanic acid, and were accompanied by invoices reflecting false prices.

VI.    Hearsay

Gambuzza contends also that his conviction must be vacated because his trial was prejudiced by inadmissible, prejudicial hearsay evidence. At the start of trial, Detective Shane LaVigne, who investigated the conspiracy, was asked by the prosecutor to tell the jury how he got involved in an investigation of dealings in "Molly" in Syracuse. He answered that "a source" came to him and advised him that "there's a new type of Molly in Syracuse," and clarified that "Molly" signifies the "purest form powder MDMA." App.

35

141-42. He recounted that the source had told him that Harper was the "primary distributor" of the Molly, that "Rosario Gambuzza was also on approximately the same level as [Harper]," and that "Gerry Gero, Vincent Cizenski, [and] Johnny May" "were also involved in this organization that was trafficking Molly." *Id.* at 145.

The detective further quoted his source as having told him "that there was going to be a narcotics transaction slash robbery in the 300 block of Montgomery Street," where "there would be a black Cadillac owned by Rosario Gambuzza and there was a kilo of cocaine in the trunk. . . . [D]uring the transaction where that kilo was going to be sold, . . . a third-party would be conducting a robbery." *Id.* at 142-43.

LaVigne explained that "[an] informant is someone we build credibility to, based on their information. We have to corroborate things they tell us to make sure they are telling us correct information and to deem them reliable and credible." *Id.* at 144. He then confirmed that he was "able to make use of this informant," *id.*, apparently meaning that he had confirmed the informant's reliability. He added that such tips were a sort of information "often relied upon by law enforcement regarding investigations." *Id.* at 141.

LaVigne's testimony relaying the statements he had heard from the informant was inadmissible hearsay to the extent it might be considered by the jury "for the truth of the matter asserted" in the informant's quoted statements. Fed. R. Evid. 801(c) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."). When Defendant objected on hearsay grounds, the prosecutor argued, and the district court agreed, that the evidence was permissible because it was offered not for the truth of the informant's statements but as "background of what [LaVigne] did, why he went to this location." App. 143.

In a trial of Gambuzza for conspiracy to deal in analogues of Molly (MDMA), the content of the informant's statements about Gambuzza's high-level involvement in trafficking "a new type of Molly" (as well as other drugs) was highly prejudicial to Gambuzza, especially as the unnamed informant, who was the source of the information, was not present on the witness stand to be cross-examined by Gambuzza's lawyer as to his basis for making those statements. The prejudice was intensified by the detective's assurances to the jury that the informant's reliability had been verified and

that such information is "often relied upon by law enforcement," which was difficult to reconcile with the Government's contention that this evidence was not offered for the truth of the informant's assertions.

The Government now wisely concedes that this evidence was hearsay. It should not have been offered. How LaVigne got involved in an investigation of dealings in Molly in Syracuse had little or no relevance to any issue before the jury. To the extent the informant's statements to LaVigne might have had some slight insignificant relevance, as explaining why the detective went to the 300 block on Montgomery, this could have been adequately conveyed by eliciting that an informant had given information about expected activities at that location, without repeating the information about Gambuzza's dealings in the new form of Molly, of the kilo of cocaine in his trunk, or of the planned "narcotics transaction slash robbery." The vast majority of LaVigne's report of his source's tips had no proper role in the Government's evidence other than to communicate to the jury incriminating hearsay information about Gambuzza.

While hearsay may at times be received to explain relevant background circumstances, *see United States v. Reyes*, 18 F.3d 65, 70 (2d Cir. 1994)

(collecting cases), we explained in *Reyes* that the propriety of resort to such hearsay depends heavily on "whether the probative value of this evidence for its non-hearsay purpose is outweighed by the danger of unfair prejudice resulting from the impermissible hearsay use of the declarant's statement." *Id.* In this instance, the value of the non-hearsay use to explain LaVigne's actions was practically nil, while the prejudice flowing from the jury's consideration of the content of the informant's tip was substantial and obvious.

The Government nonetheless argues that the receipt of the hearsay evidence was harmless in the context of the evidence against Gambuzza. We disagree. "In order to uphold a verdict in the face of an evidentiary error, it must be highly probable that the error did not affect the verdict." *United States v. Dukagjini*, 326 F.3d 45, 61 (2d Cir. 2003) (internal quotation marks omitted). "A district court's erroneous admission of evidence is harmless 'if the appellate court can conclude with fair assurance that the evidence did not substantially influence the jury.'" *United States v. Al-Moayad*, 545 F.3d 139, 164 (2d Cir. 2008) (quoting *United States v. Garcia*, 291 F.3d 127, 143 (2d Cir. 2002)). Here, we cannot conclude "with fair assurance" that the hearsay evidence did not "substantially influence the jury." *Id.* (internal quotation marks omitted).

The testimony, which was offered at the very beginning of the trial, indicated that Gambuzza was a "primary distributor" of Molly and that he would be involved in a "narcotics transaction slash robbery" involving a kilo of cocaine in the truck of his car. The Government, in addition, sought to bolster the credibility of the hearsay by eliciting LaVigne's testimony that he had personally assessed and verified the informant's credibility. The potential prejudice of this testimony was substantial. Although it is true that the Government offered ample additional evidence against Gambuzza, we cannot conclude—given the highly prejudicial nature of the testimony—that the testimony did not have a "substantial and injurious effect or influence on the jury's verdict." *United States v. Groysman*, 766 F.3d 147, 155 (2d Cir. 2014) (internal quotation mark omitted).

The Government argues that Gambuzza did not make a timely objection to the introduction of this hearsay. We disagree. When the Government began this line of inquiry, Gambuzza objected on the ground of hearsay; the district court overruled the objection without explanation. As the questioning proceeded, Gambuzza renewed the objection. The district court overruled the objection again, notwithstanding that LaVigne had already

quoted the informant to the effect that "there's a new type of Molly in Syracuse," and that "there was going to be a narcotics transaction slash robbery in the 300 block of Montgomery Street" involving "William Harper, and . . . Rosario Gambuzza," and had validated the informant's tip as "a form of information often relied upon by law enforcement." App. 141-42. Gambuzza had objected sufficiently. He was not obliged to repeat the objection for every further iteration of this prejudicial hearsay. [8]

## CONCLUSION

Demott's conviction on his guilty plea is AFFIRMED. The convictions of Snell and Gambuzza are VACATED. Their cases are REMANDED for further proceedings consistent with this opinion.[9]

---

[8] We have considered Defendants' other challenges to the conduct of the trial and find them to be without merit. We express no view on Snell's and Gambuzza's challenges to their respective sentences.

[9] In view of footnote 7, *supra*, prior to publication, this opinion has been circulated among the active judges of this court.

WESLEY, *Circuit Judge*, concurring:

I agree that *McFadden v. United States*, 135 S. Ct. 2298 (2015) presents some significant interpretive challenges with respect to the Federal Analogue Act (the "Act" or the "Analogue Act"). I write separately only to offer my views on how *McFadden* requires us to resolve this case.

The Controlled Substances Act (the "CSA") prohibits the distribution of a "controlled substance," 21 U.S.C. § 841, which it defines as any drug or substance listed on schedules I through V. *Id.* §§ 802(6), 812(b). The CSA also gives the Attorney General the authority to add or remove substances from the CSA by rule. *Id.* § 811(a). The current schedules are codified in the Code of Federal Regulations, 21 C.F.R. §§ 1308.11–1308.15.

Congress enacted the Analogue Act, 21 U.S.C. § 813, in 1986 in response to a proliferation of dangerous designer drugs that were beyond the reach of the CSA because they were not listed on the CSA schedules. As the Senate Judiciary Committee explained in considering the bill that eventually became the Act, "the purpose of this legislation [is] to prohibit persons who specifically set out to manufacture or to distribute drugs which are substantially similar to the most dangerous controlled substances from engaging in this activity." S. Rep. No. 99-

196 at 5 (1985) (internal quotation marks omitted). The Act was necessary, the Committee report explained, because law enforcement authorities often found themselves one step behind underground chemists who, through "molecular tinkering," were able to create new and dangerous drugs not listed on the CSA schedules. *Id.* at 1–2, 5. The parallel House bill reflected the same concerns. *See* H.R. Rep. No. 99-848 at 4 (1986).[1]

Consistent with its purpose of regulating designer drugs, the Act treats a controlled substance analogue that is sold for human consumption "as a controlled substance in schedule I" for the purposes of federal law. *McFadden*, 135 S. Ct. at 2303 (quoting 21 U.S.C. § 813). A controlled substance analogue, in turn, is any substance, "the chemical structure of which is substantially similar to [that] of a controlled substance in schedule I or II" (the chemical structure element), and "which has [an actual, claimed, or intended] stimulant, depressant, or

---

[1] The report from the House Committee on the Judiciary explained that Congress was called to act after the Attorney General and the Drug Enforcement Agency expressed concerns that even with expedited "emergency scheduling," the lag time between the identification of a designer drug and its official listing on the CSA was still three to five months. *Id.* at 3. The problem with the emergency scheduling procedure, the Senate report explained, is that it "is entirely reactive and can only operate after a controlled substance analog has already been shown to pose a severe risk to public health." S. Rep. No. 99-196 at 2. Thus, the House report concluded, "[t]he only way to effectively protect the public is to investigate and prosecute these [illicit] chemists for their new discoveries prior to formal control of the drugs." H.R. Rep. No. 99-848 at 5.

2

hallucinogenic effect on the central nervous system that is substantially similar to or greater than [that] of a controlled substance in schedule I or II" (the physiological effect element). 21 U.S.C. § 802(32)(A).

*McFadden* clarified the elements that the Government must prove to support a conviction for distribution of a controlled substance analogue. Specifically, the Act defines an analogue in terms of its chemical structure and its actual, claimed, or intended physiological effects. *Id.* If a substance qualifies as an analogue, it is treated exactly like a schedule I controlled substance. *McFadden*, 135 S. Ct. at 2304–05 (quoting 21 U.S.C. § 813). The CSA contains a "knowingly or intentionally" *mens rea* requirement, 21 U.S.C. § 841(a)(1); the Analogue Act therefore also includes a knowledge element. *McFadden*, 135 S. Ct. at 2305.[2]

---

[2] The Senate Judiciary Committee that drafted the precursor to the Analogue Act was explicit about this requirement:

> [T]o be found guilty, an offender's manufacture, distribution, or possession of an illicit substance must have been knowing or intentional; that is, the offender must have known or intended that he was manufacturing, distributing, or possessing a substance that he knew or intended to have the characteristics of a controlled substance analog as defined in section 3 of this legislation.

S. Rep. No. 99-196 at 4.

Simply put, to sustain a conviction under the Analogue Act, *McFadden* requires that the Government prove the defendant: "(1) distributed a substance that had the chemical structure of an analogue and the actual, intended, or claimed physiological effects of an analogue;"[3] "(2) intended that the substance be used for human consumption;" and (3) knew either the substance's (a) regulatory and legal status under federal law or (b) chemical composition and physiological effects. *United States v. McFadden*, 823 F.3d 217, 223 (4th Cir. 2016) (interpreting the Supreme Court's *McFadden* decision on remand). Only the third element—knowledge—is genuinely at issue in this appeal.

As Judge Leval's opinion correctly explains, *McFadden* identified and expanded upon the two methods of establishing knowledge. *Supra* at 21–23. Under the second method described in *McFadden*—not at issue in this case—the Government may produce evidence that the defendant knew the chemical composition and physiological effects of the substance he was selling, regardless

---

[3] A substance has the chemical structure of an analogue if it is "substantially similar to [that] of a controlled substance in schedule I or II," and a substance has the actual, intended, or claimed physiological effects of an analogue if it has a "stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than [that] of a controlled substance in schedule I or II." 21 U.S.C. § 802(32)(A).

of whether the defendant knew the legal status of the substance. *McFadden*, 135 S. Ct. at 2305.[4] Indeed, this is what happened in *McFadden*: on remand to the Fourth Circuit, the court held that the Government had introduced "overwhelming" evidence that McFadden had "thorough and detailed knowledge of [the] chemicals [he was convicted of selling], their chemical structures, their effects, and their similarity to other controlled substances." *McFadden*, 823 F.3d at 226–27. However, the Government will rarely be able to meet that standard; it is an unusual case in which a defendant is a chemist with a special propensity for manufacturing designer drugs. *But see id.* at 226–28 (finding that the Government presented "overwhelming evidence" that McFadden "had knowledge of the analogues' chemical structures and physiological effects"); Breaking Bad (AMC television broadcast 2008–13), http://www.amc.com/shows/breaking-bad.

---

[4] Chief Justice Roberts, concurring in the judgment and concurring in part, wrote separately in *McFadden* to explain that he parted ways with the majority's conclusion that the Government can satisfy the knowledge requirement under the CSA or Analogue Act "by showing that the defendant knew the identity of the substance he possessed," regardless of whether he knew that the substance was controlled. *Id.* at 2307 (Roberts, *C.J.*, concurring) (quoting *id.* at 2304 (majority opinion)). The problem that Chief Justice Roberts identified is that ignorance of the law can be a defense when the offense's definition includes a legal element; in federal drug prosecutions, "there is arguably a legal element . . . —that the substance be 'controlled.'" *Id.* at 2308. Where, like here, the Government brings a case under the first method of proof—that the defendant knew the substance was illegal under federal law—Chief Justice Roberts's concern is not present.

Only the first method of proof described in *McFadden* is at issue here. Under that method of proof, the Government may produce evidence that the defendant knew that he was dealing "some controlled substance—that is, one actually listed on the . . . schedules or treated as such by [the Analogue Act]—regardless of whether he knew the particular identity of the substance." *McFadden*, 135 S. Ct. at 2305. In other words, the Government may prove knowledge by showing that the defendant knew he was selling a controlled substance analogue (a substance that is illegal under federal law), even if he did not know the chemical structure or physiological effects of that substance. The Government will rely on this means of proving knowledge in the vast majority of cases brought under the Act, and, in general, the Government will use circumstantial evidence to satisfy its burden.[5] For example, the Government might introduce evidence that a defendant behaved surreptitiously, concealed evidence in a manner consistent with the sale of illegal drugs, was told that the substance was illegal, or knew that the substance was likely to be seized at customs. *See id.* at 2304 n.1 (describing circumstantial

---

[5] It is unlikely but not impossible that the Government will be able to produce direct evidence of the defendant's mental state. Consider, for example, a person who is convicted of selling an analogue and is sent to prison. If the person were released from prison before the analogue was listed on the CSA schedules, and then charged a second time with selling the same analogue, the Government would have direct evidence of the defendant's knowledge that the substance is regulated under the Analogue Act.

evidence of knowledge that may be sufficient to support a conviction under the Act). That kind of evidence supports the knowledge element because it raises an inference that the defendant was aware of the substance's legal status. Thus, if the circumstantial evidence, taken together, establishes beyond a reasonable doubt that a defendant knew he was selling a substance that was illegal under federal law, the Government has met its burden. *Id.* This is the type of evidence the Government used in its attempt to prove knowledge in this case.

Gambuzza and Snell challenge the jury instructions that produced their convictions. That challenge presents two straightforward questions of law: (1) was it reversible error for the district court to tell the jury that the defendants must have known that they were selling substances that were "controlled or regulated by the federal drug abuse laws," App. at 978, and (2) was it reversible error for the district court to instruct the jury that "knowledge of or intent to violate the law is not an element" of the Analogue Act, *id.* at 978, 1023. I agree with Judge Leval's opinion that the answers to the questions are, respectively, no and yes. My only quarrel with his opinion has to do with how much analysis of *McFadden* and its difficulties is necessary to reach those answers.

On the first question, Judge Leval concludes that there was no error because the court's instruction—"controlled by the federal drug abuse laws"—was "very close to literal conformity to what the *McFadden* Court said." *Supra* at 28-29. That is all we need to, or should, say. On the second question, a similarly limited amount of analysis is necessary: a prosecution under the Analogue Act requires that the Government prove the defendant knew he was selling a controlled substance. The court here told the jury that knowledge is not an element of a prosecution under the Analogue Act; that instruction was error. *See McFadden*, 135 S. Ct. at 2303–05. The only remaining question is whether that error was so prejudicial that we must vacate the drug convictions, and I agree that it was. *Supra* at 33-34. Knowledge was the only truly disputed element in this trial, and once the court told the jury that knowledge was not an element at all, the jury had no choice but to convict. Under the harmless error standard, I agree with the majority that Snell and Gambuzza are entitled to have their convictions vacated. *See Arizona v. Fulminante*, 499 U.S. 279, 306–07 (1991); *Chapman v. California*, 386 U.S. 18, 24 (1967).

It is our job to decide the case before us and to interpret *McFadden* in a way that provides guidance to the district courts. To the extent we can, we should avoid replicating any confusion the Supreme Court sowed with *McFadden*.

8

I do not disagree with Judge Leval that *McFadden* raises as many questions as it answers. I simply see no need to dwell on the difficulties it presents when they do not impair our resolution of this case. When one boils *McFadden* down to its essential holding, all the jury instructions need say about knowledge in a prosecution under the Analogue Act is that the defendant must have known that he or she was dealing in a controlled substance. I respectfully concur.